1

1  UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2  HONORABLE CHRISTINA SNYDER, U.S. DISTRICT JUDGE

3
   CLAUDIA GARCIA,
4
                    Petitioner,
5
     v.                              Case No.
6                                    2:19-cv-09356-CAS and
   UNITED STATES OF AMERICA,         2:13-cr-00484-CAS-11
7
                    Respondent.
8  _____

9

10

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                      EVIDENTIARY HEARING
12               TUESDAY, DECEMBER 14, 2021
                        10:20 A.M.
13                 LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22  _____

23              JUDY K. MOORE, CRR, RMR
               FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, #4455
               LOS ANGELES, CALIFORNIA 90012
25                    213.894.3539

**2**

<pre>
 1                              APPEARANCES

 2  FOR THE PLAINTIFF:          MR. J. MARK CHILDS
                                Assistant United States Attorney
 3                              312 North Spring Street
                                Suite 1400
 4                              Los Angeles, California 90012

 5

 6  FOR THE DEFENDANT:          MR. ANDRES ORTIZ
                                Andres Ortiz Law
 7                              320 Pine Avenue
                                Suite 608
 8                              Long Beach, California 90802

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1                  (Proceedings commenced at 10:20 a.m.)

2              COURTROOM DEPUTY:  Calling Item Number 1,

3  CV19-9356-CAS and CR13-484, Defendant Number 11, Claudia Garcia

4  versus United States of America.

5              Counsel, please state your appearances.

6              MR. CHILDS:  Again good morning, your Honor.  Mark

7  Childs on behalf of the United States.

8              MR. ORTIZ:  Good morning, your Honor.  Andre Ortiz

9  on behalf of the defendant petitioner.

10             THE COURT:  Good morning.  Okay.  So just so

11  everyone can hear me for a minute, I'm going to lower my mask

12  and then put it back on.  Do we have -- have you discussed how

13  you want to proceed?

14             MR. CHILDS:  Yes, your Honor.  And Mr. Ortiz can

15  correct me if I'm wrong.  We'll only have one witness today.

16  That will be the attorney James Bisnow.  I will simply have

17  Mr. Bisnow acknowledge that he signed the interrogatories that

18  were submitted as part of the Government's opposition, and then

19  I'll turn it over for cross-examination and then whatever

20  limited redirect, and hopefully we'll be done with the

21  testimony.

22             But what I do propose and what I briefly chatted

23  with Mr. Ortiz about before the hearing is that I think this is

24  -- may be a process that we can follow, if the Court's so

25  inclined:  We can have the evidentiary hearing today, see what

1  Mr. Bisnow says.  We can get a copy of the transcript, both

2  myself and counsel can review it, and then the Government would

3  be inclined to discuss maybe settling this case without further

4  litigation.  And so if we can come to an agreement on that,

5  there will be no need to do argument on the case or the Court

6  spend the time issuing a ruling.

7         And so what I would recommend is that we have 30

8  days after today to get the transcript, to try to negotiate

9  something out.  If that falls through, we'll come back, do

10 argument, and then the Court can do what the Court needs to do.

11        THE COURT:  Okay.  Mr. Ortiz?

12        MR. ORTIZ:  And, your Honor, yes, that was what we

13 discussed.  You know, obviously, this is the -- you know, the

14 Court's -- we'll leave it up to the Court's discretion in terms

15 of ultimately what the Court would like to do, but yes, we are

16 amenable to settling this case.  I do think that there are a

17 number of reasonable alternatives that would, you know, protect

18 Mr. Bisnow, protect the interest of the Government, and also

19 represent a non-deportable crime.  So we would definitely be

20 open to doing that.

21        THE COURT:  Okay.  Well, I think that's wise because

22 right now I really have a -- all I can say is a Hobson's

23 choice, because if I set aside the guilty plea, then I suppose

24 you all go to trial.  And if Ms. Garcia is acquitted, that's

25 one thing, but if she's convicted, she is going to be facing

1  more time in prison.  It seems to me to be somewhat

2  counterproductive, so I would like you to use your creative

3  skills to see if there's an alternative solution.

4          MR. CHILDS:  And we will, your Honor.  And the

5  Government is in no way conceding that our opposition isn't

6  meritorious.

7          THE COURT:  I'm not either.  I mean, obviously,

8  Judge Reinhardt wrote a very compelling opinion based on a very

9  compelling set of facts.  He was one of my very good friends in

10  the judiciary.  I have the utmost respect for him and great

11  memories of him.  But that said, this case is a bit different.

12          MR. CHILDS:  Okay.  Thank you, your Honor.

13          MR. ORTIZ:  Thank you.

14          THE COURT:  Okay.  So I guess the first order of

15  business is to call Mr. Bisnow?

16          MR. CHILDS:  Yes, your Honor.

17          THE COURT:  Okay.

18          MR. CHILDS:  Your Honor, may I address Mr. Bisnow

19  from here, or do I need to go to the lectern?

20          THE COURT:  I think you can address him from there,

21  as long as he can hear you.  And as long as that's okay with

22  Ms. Garcia and Mr. Ortiz, it's fine with me.

23          MR. ORTIZ:  We have no issue with it, your Honor.

24          THE COURT:  Okay.

25          COURTROOM DEPUTY:  Your Honor, may I swear the

1  defendant in?

2          THE COURT:  You may.

3          MR. CHILDS:  I think it's the witness, not the

4  defendant.

5          COURTROOM DEPUTY:  Oh, I'm sorry.  Sorry about that.

6  Yes, it's the witness.  Apologies.

7          THE COURT:  The guy over there on the screen.

8          (Witness sworn.)

9          THE COURT:  Can you hear Mr. Bisnow, or do we need

10 to do something here?

11         THE WITNESS:  No.  I can hear and I can see you.

12         THE COURT:  Well, I'm not sure we can hear you as

13 well as we'd like, but let me ask counsel.

14         MR. ORTIZ:  Your Honor, it's very faint for us.

15         THE WITNESS:  Can you hear me now?

16         THE COURT:  Yes, much better.  And I'm most

17 concerned, Ms. Garcia, can you hear him?

18         THE PETITIONER:  Yes, your Honor.

19         MR. CHILDS:  Your Honor, may I proceed?

20         THE COURT:  You may.

21         MR. CHILDS:  AUSA Mark Childs on behalf of the

22 United States.

23                       DIRECT EXAMINATION

24 BY MR. CHILDS:

25 Q.   Good morning, Mr. Bisnow.

1  A.    Good morning.

2  Q.    How are you doing today?

3  A.    Good.

4  Q.    I have a short set of questions for you, and they concern

5  your answers to interrogatories that were provided to the

6  Government and submitted as part of the Government's

7  opposition.  Do you have those answers to interrogatories in

8  front of you?

9  A.    I do.

10 Q.    And that's an 11-page document, correct?

11 A.    Correct.

12 Q.    And it's entitled "James Bisnow's Answers to

13 Interrogatories"?

14 A.    Yes.

15 Q.    And you signed a declaration on Page 11 of those answers

16 to interrogatories on February 18, 2020; is that correct?

17 A.    I did.

18 Q.    And at the time that you signed the answers to

19 interrogatories, were the answers to the special

20 interrogatories true and correct, to the best of your

21 knowledge?

22 A.    Yes.

23 Q.    And then how long did you spend answering the

24 interrogatories, approximately, if you recall?

25 A.    Oh, it was over a period of a few days, so several hours.

8

1   Q.    And the answers -- do you have the -- do you have the

2   actual interrogatories in front of you, the questions that were

3   asked?

4   A.    Yes.

5   Q.    And that's a pleading, correct, entitled "First Set of

6   Interrogatories Propounded on James S. Bisnow"; is that

7   correct?

8   A.    Well, the copy that I have just says, "Interrogatories to

9   James S. Bisnow."  It starts on Page 3 and goes to Page 8.

10  Q.    Okay.  That's after the instructions, so on Page 3 of the

11  first set of interrogatories propounded on James S. Bisnow,

12  there's -- it's entitled -- Page 3 is entitled "Interrogatories

13  to James S. Bisnow"; is that correct?

14  A.    Yes.

15  Q.    And the interrogatories are listed on Pages 3 through 8;

16  is that correct?

17  A.    Yes.

18  Q.    And you used these interrogatories -- you answered these

19  interrogatories on Pages 3 through 8, correct?

20  A.    Correct.

21          MR. CHILDS:  I have no further questions, your

22  Honor.

23          THE COURT:  Okay.  Mr. Ortiz?

24          MR. ORTIZ:  Thank you, your Honor.  And may I use

25  the lectern?

1            THE COURT:  Of course.

2            MR. ORTIZ:  Thank you, your Honor.

3                       CROSS-EXAMINATION

4  BY MR. ORTIZ:

5  Q.    So, Mr. Bisnow, can you hear me?

6  A.    I can.

7  Q.    Thank you.  I'm Andre Ortiz on behalf of the

8  defendant/petitioner.

9            So, Mr. Bisnow, first and foremost, I want to thank

10 you for taking time out to speak with us today.  I regret the

11 circumstances that we're having this conversation, but I

12 appreciate what you have tried to do for Ms. Garcia and hope

13 that you understand that any of the questions that we ask or

14 anything that's going on is in no way a reflection of how we

15 feel about you as an attorney who has had a long career and who

16 has been an advocate for many defendants throughout your

17 career.

18 A.    I understand.

19 Q.    Thank you.  So with that being said, how long have you

20 been practicing law?

21 A.    Since '75, so how long is that?

22 Q.    About 44 years.  And what types of cases do you handle?

23 A.    Just criminal --

24 Q.    Just criminal?

25 A.    -- trial and appeals.

1  Q.    And have you done any post-conviction cases?

2  A.    Yes, a number of them.

3  Q.    And were any of those post-conviction cases related to

4  ineffective assistance of counsel?

5  A.    Yes.

6  Q.    Have you ever requested attorney notes in those cases?

7  A.    No.

8  Q.    Do you think that -- or do you have a pattern and

9  practice of keeping notes?

10  A.    No.

11  Q.    And why not?

12  A.    I just had never done that.  One thing is that, in my

13  business, clients, not this one but others, sometimes say

14  different things, and I'm -- and I'm not interested in keeping

15  a paper trail to hurt them.  So I haven't found those useful.

16  Q.    Understood.  In your interrogatories, you said that you

17  attended criminal immigration seminars --

18  A.    Yes.

19  Q.    -- where they discussed *Padilla v. Kentucky*?

20  A.    Yes.

21  Q.    And when were those seminars?

22  A.    You know, I don't have any dates or times, but, you know,

23  that was -- there was usually something in some of the

24  seminars.  You know, it's one hour --

25  Q.    Sure.

1  A.     -- and I couldn't tell you when.

2  Q.     So I don't suppose that you would remember who put the

3  seminars on?

4  A.     No.  Well, usually I go to CACJ, California Attorneys for

5  Criminal Justice.

6  Q.     Okay.

7  A.     But I've gone to a number -- I've gone to many seminars

8  in 44 years.

9  Q.     Fair.  They've already started to bleed together for me

10  as well, so understood.

11          So what is your understanding of defense counsel's

12  obligations towards non-citizen clients?

13  A.     My understanding is that my obligation is to inform the

14  client of immigration consequences as I know them and also to

15  try to work out a non -- an immigration-neutral disposition, if

16  I can.

17  Q.     Sure.

18  A.     But I also see my job as more than that.  It is -- just

19  because I have a person who is an immigrant who might have

20  problems with the law, I also have to look at the big picture,

21  and in particular, I have to look at how much time they're

22  looking at and what's possible.  Some things just aren't

23  possible.

24  Q.     Sure.  And are you familiar with the difference between a

25  plea that may cause immigration consequences and one that will

1  cause immigration consequences?

2  A.    Well, I'm not -- I wouldn't say I'm an expert at that,

3  no.

4  Q.    Sure.

5  A.    You know, if you have a test on it, I don't know that I'd

6  be an expert on it.  All I know is that, in this case, I was

7  aware that there were immigration consequences for selling --

8  for allegedly selling or possessing with the intent to sell

9  100 kilos of marijuana.  And I knew that that consequence was

10 going to be deportation unless the Government gave some deal,

11 which they wouldn't give.

12 Q.    Understood.

13 A.    And because of that, I mean, you know, I just feel like

14 in answering these questions, to answer them truthfully, you

15 have to look at the whole thing, and once I determined that

16 there was nothing that I could possibly do about the

17 immigration consequences because the Government, Mr. Childs,

18 steadfastly refused to give me anything and laughed at me, I

19 had to turn my attention to the only thing that mattered now,

20 which is the amount of time.

21 Q.    Understood.  So are you aware of the difference between

22 inadmissibility and removability?

23 A.    No.

24 Q.    Okay.

25       MR. ORTIZ:  So if I can, your Honor, I'm just going

1  to use the projector.  I think that it should show.

2  BY MR. ORTIZ:

3  Q.    So this is the definition of admissibility.

4  Admissibility is someone who has lawfully entered the United

5  States after being inspected by an immigration officer.  And so

6  are all of the grounds of inadmissibility and removability the

7  same?

8  A.    See, I'm not clear.  I am not familiar with the concept

9  of inadmissibility.  You just defined it as someone who's

10 lawfully been allowed to come into your country, admissible.

11 Q.    So that would be somebody who's removable.  So if we

12 think about --

13 A.    Well, let me -- I'm sorry.  I've missed -- the definition

14 that you read, was that --

15 Q.    Was somebody who has been admitted.

16 A.    Okay.  So that's someone who's admissible?

17 Q.    No.  Somebody who has not received official permission to

18 enter the United States and, by analogy, would be knocking at

19 the door is somebody who is inadmissible.  Somebody who has

20 satisfied the definition that I just showed you is somebody who

21 is removable.

22 A.    Okay.  I'm not following you.  The definition you showed

23 me is that someone is lawfully admitted into the United States.

24 That person is removable?

25 Q.    Correct.

1  A.    Okay, I don't follow that.

2  Q.    Okay.  Well, there are two sets of ways that somebody can

3  be removed from the United States.  One way is for somebody who

4  is, by analogy, knocking at the door who has never received

5  permission from the United States Government to enter the

6  United States.  Somebody who is removable is someone who has

7  been admitted in a non-immigrant status or on a green card

8  status, and the Government is trying to remove him or her.

9  A.    Okay.  I understand the difference now.  Ms. Garcia was

10 legally admitted into the United States, I believe.

11 Q.    So -- yes, you're correct, so that she would be

12 removable, as opposed to inadmissible.

13 A.    Okay, I get it.

14 Q.    Okay.  And for somebody who is removable as opposed to

15 inadmissible, are all of the grounds of inadmissibility and

16 removability exactly the same?

17 A.    I couldn't possibly answer that because, until today, I

18 never knew the distinction.

19 Q.    Very well.  If I may --

20 A.    Never in the criminal seminars that I attended regarding

21 *Padilla* was that ever brought up, and I don't believe that I

22 read it in *Padilla* or any other case, criminal case.

23 Q.    Understood.  So Ms. Garcia was your client, correct?

24 A.    Yes, she was.

25 Q.    And she told you that she was not a citizen?

A.    That's correct.  I believe she told me that she had a green card, and she wanted to know whether this is going to affect it.  And she was scared about losing her green card.

Q.    Uh-huh.

A.    And as I, you know, said in my answers, we went over that.  And I could see that in 2008, with another boyfriend, I think, she got in trouble for selling drugs.  And I could see they worked out a very odd disposition, which was that she pled guilty, did time, and then they reduced it to possession.  And I could see that that had to do with her immigration consequences.  And I told her, I can't help you like that.

Q.    Understood.

A.    I can't do anything for you.  You are deportable.

      And then we talked to Mr. Childs, and after I talked to Mr. Childs, I said, I still can't help you.  There's nothing I can do with respect to immigration.  You are deportable.  You have no protection.  All we -- all I can do is talk about the time in this case.

      And if you go to -- and I have to say, Mr. Ortiz, you know, as an attorney, you have to have a plan, and I definitely steered her toward a plea because I could see that if she went to trial with Mr. Childs, she could easily get five years, maybe even ten years.  I've seen people do that.  I've seen girls get time like that because they're known as secretaries.  They're helping the big guy.  And I didn't want

1  that to happen to her.  And I told her I didn't want it to
2  happen and I said, furthermore, if you went to trial and you
3  say, you know, I don't want to be deported, I don't want -- I'd
4  lose my green card, if you go to trial, that's not going to
5  help because you go to trial, you're going to get convicted,
6  you have no defense, and you're -- and the same result will
7  happen.  I can't protect you.  I can't protect you from the
8  immigration consequences.
9  Q.    And, again, Mr. Bisnow, I don't think anybody is
10  questioning that you did everything that you thought was right
11  at the time and --
12  A.    But, you know -- I'm sorry to interrupt, but I still
13  believe it's right.  I mean, if I have this case now -- one
14  thing -- a couple of things have happened during the interim.
15  The safety valve requirements have changed, making her perhaps
16  eligible for safety valve.  And also, there was a good result
17  by some of the defendants who weren't related to her exactly at
18  trial.  But even today, looking at what I had then, I would do
19  exactly the same.
20  Q.    Understood.  So if we can just kind of get back on track,
21  so you said that she did have her green card, and you had also
22  said through the investigative report that she had had it since
23  she went through the amnesty program?
24  A.    That, I don't remember.  What report are you talking
25  about?  I'm -- you're telling me something I don't recall at

1  all.  In other words...

2  Q.    Sure.  So this is the report that you had filed with the

3  sentencing position.  I can Zoom --

4  A.    Right.

5  Q.    So it says right here that she became a legal resident

6  through the amnesty program.  I think that this was an

7  interview that was conducted by the investigator?

8  A.    Okay.  Mr. Gonzales is my private investigator.  That's

9  right.

10  Q.    Yes.

11  A.    So he interviewed who?

12  Q.    It looks like Ms. Garcia's mother, Blanca Rangeal (ph)?

13  A.    Okay.  So I'd forgotten that, but I now -- you've

14  refreshed my recollection.

15  Q.    Sure.  And then just for the Court, this is a copy of Ms.

16  Garcia's green card saying that she was a permanent resident

17  since 1990.

18        MR. ORTIZ:  Mr. Childs, is the Government agreeable

19  to that?

20        MR. CHILDS:  I'm sorry.  Say that again.

21        MR. ORTIZ:  Is the Government agreeable to that

22  stipulation?

23        MR. CHILDS:  That she's been a lawful legal

24  permanent resident since 1990?

25        MR. ORTIZ:  Yes.

1       MR. CHILDS:  The Government has no reason to not

2  stipulate.

3       MR. ORTIZ:  Okay.

4  BY MR. ORTIZ:

5  Q.   So as somebody who is a permanent resident, was Ms.

6  Garcia --

7       MR. CHILDS:  I'm sorry.  Excuse me, Mr. Ortiz.  I

8  have a copy of her green card, and just for the record, it

9  says, "Residence since October 1st, 1990."  So, yes, the

10  Government will stipulate.

11       MR. ORTIZ:  And I have a copy for the Court, too, if

12  it would like.

13       THE COURT:  Sure.  You may approach the courtroom

14  deputy.

15  BY MR. ORTIZ:

16  Q.   So in the interrogatory response --

17       MR. ORTIZ:  Sorry, your Honor.  I'll proceed when

18  you're ready.

19       THE COURT:  No, I'm ready.

20  BY MR. ORTIZ:

21  Q.   In the interrogatory response, you indicated that the

22  first thing that you sought to do was to put -- or try to get

23  Ms. Garcia into the CASA program.

24  A.   Yes.

25  Q.   How would that affect her immigration status?

1   A.    You know, we never got that far.  So if she got into

2   CASA, then I would have had to have discussions with the CASA

3   prosecutor as to see what that plea agreement says and whether

4   it would require her to plead or whatever.  I don't know the

5   answer to that.  But I know this, sir, Mr. Ortiz:  That of 100

6   CJA's and public defenders, if she had gotten a CASA, 99 would

7   have said that was a great thing, considering what she's

8   facing.  But I don't know -- I can't tell you what the

9   immigration consequences of CASA would have been because we

10  never got that far.

11  Q.    Understood.

12  A.    But that would have removed her going to jail.  It would

13  have taken away five or ten years over her head, and she would

14  get zero.

15  Q.    And do you remember the specific immigration consequence

16  Ms. Garcia pled to?

17  A.    I don't know what that means.  She pled to a crime.

18  Q.    Right.  And how was that crime classified for immigration

19  purposes?

20  A.    That, I don't know.

21  Q.    Well, before the Court --

22  A.    I believed it to be --

23  Q.    Go ahead.

24  A.    I believed it to be a deportable offense.

25  Q.    But how?  How would it be a deportable offense?  Because

1   every -- every ground of removability and inadmissibility has a

2   number of distinct types of crimes that would make someone

3   deportable, so how were you able to determine, like, which

4   statute it actually fell under?

5   A.    All I know is I've always heard and believed that a

6   selling drugs is a deportable offense.  And I don't know the

7   code.  I don't do immigration law.  All I know is that Mr.

8   Childs refused to reduce it to a non-deportable offense,

9   refused to even discuss it.

10   Q.    And -- yeah, go ahead.

11   A.    As far as the categorization of crimes, I don't know.  I

12   don't know that.

13   Q.    Okay.  So...

14         MR. ORTIZ:  Just one second, your Honor.

15   BY MR. ORTIZ:

16   Q.    So before the Court, you had filed a pre-sentence report;

17   is that correct?

18   A.    I filed a sentencing position.

19   Q.    Right.

20   A.    Is that what you mean?  You see, we don't talk the same

21   language.  We're having a problem with this.

22   Q.    I know.  It's always a challenge.

23         THE COURT:  Well, let's be clear.  You're talking

24   about the pre-sentence report prepared by Probation, or are you

25   talking about a sentencing memorandum prepared by Mr. Bisnow?

**21**

1        MR. ORTIZ:  I'm talking about the sentencing

2   memorandum.

3        THE COURT:  All right.

4        MR. ORTIZ:  Okay?

5   BY MR. ORTIZ:

6   Q.    So there's a couple of excerpts that I want to read to

7   you and just kind of understand what you meant by those.

8        MR. CHILDS:  Mr. Bisnow?

9        THE WITNESS:  Yes.

10       MR. CHILDS:  I think you need to look up a little

11  bit.  There you go.  Very nice.

12       THE COURT:  Well, I think -- is the problem are you

13  on an iPad or a computer?

14       THE WITNESS:  I'm on a cell phone, your Honor.

15       THE COURT:  Okay.  You need to pull it up so it

16  covers your face.  We're just seeing half of your face.

17       THE WITNESS:  Like that?

18       THE COURT:  Better.  Better.

19       MR. CHILDS:  And then I'd also request, your Honor,

20  that the witness probably has some of these documents in front

21  of him, so rather than counsel reading an excerpt of the

22  sentencing decision --

23       THE COURT:  I think that would be preferable.

24       THE WITNESS:  Well, I have it on my computer.  Can I

25  just have one second?

**22**

1          THE COURT:  Sure.

2          THE WITNESS:  Okay.  It's Exhibit B.

3          MR. CHILDS:  That's correct, your Honor.

4          THE COURT:  Okay.  You're going to have to speak

5    into the microphone, too.  Our reporter is having a very hard

6    time.

7          THE WITNESS:  Okay.  Yes, I have it in front of me,

8    Claudia Garcia's sentencing position.

9          MR. ORTIZ:  Very well.

10   BY MR. ORTIZ:

11   Q.    So Page 1, starting on -- at the end of Line 22, it says,

12   "To Ms. Garcia:  Time served and supervised release conditioned

13   upon 12 months of intermittent confinement, home detention,

14   community confinement, implemented in a manner that permits Ms.

15   Garcia to continue working and avoid deportation."  So what did

16   that mean to you?

17   A.    Well, it meant -- when I used the word "deportation"

18   there, I meant apprehension.  And in order to understand that

19   -- you know, I said the same thing, we had that in the

20   sentencing hearing, my --

21   Q.    Mr. Bisnow, we'll get there.

22          THE COURT:  Would you let him finish, though,

23   please, Mr. Ortiz.

24   A.    I had a strategy, and my strategy was to try to get the

25   judge to give Ms. Garcia time served.  I was only interested in

1  the time.  I knew that I couldn't change the deportation -- the

2  legal deportation consequences.  But we have a hole in our

3  system, and this hole in the system is that the judge, the

4  district judge who sits in the criminal trial, doesn't sit in

5  immigration.  And immigration, although might be mandatory, is

6  not automatic.  So what I'm saying there is if you leave her in

7  the community and you don't send her to prison, maybe she won't

8  come to the attention of the immigration authorities and she

9  won't be physically apprehended.  I did not mean that by a

10  sentence of probation she would -- there would be somehow a

11  consequence that she would not be subject ever in her life...

12          MR. ORTIZ:  Sorry, I think we lost you.

13          MR. CHILDS:  He'll have to repeat.

14          THE WITNESS:  I tried to get her less time.  That's

15  why I wrote that.  I thought that it would be appealing to the

16  judge that -- I mean, she had such a great story because she

17  had changed her life.  She was in with terrible Mr. Luis Vega.

18  Everybody understood that.  She had a bad life, but she had

19  turned herself in to jail and she had made -- for that other

20  immigration problem -- or the other criminal problem, and

21  Mr. Vega had gone to jail.

22          And then she, because of her children, made a

23  decision that she wanted to go straight.  And I knew she had a

24  compelling story, so I'm just saying to the judge, why don't

25  you leave her out, and maybe they won't deport her, they won't

1  physically deport her.  But I never meant or thought by that

2  that I was somehow saying that the immigration court -- that

3  she would be free of the immigration court forever.  I never --

4  I never meant that.  I know that reading it, you see the word

5  deportation, and I guess if I had to write it all over, I would

6  say physical deportation.  What I'm asking the Federal judge to

7  do is to --

8            THE COURT:  Just a minute.  You're freezing.

9            MR. ORTIZ:  Sorry.  We've lost connection, I

10  believe.  Sorry.  We lost connection.  Could you repeat that?

11            THE COURT:  What you were asking the Federal judge.

12  You cut off there.

13            THE WITNESS:  Well, yes.  I was asking the Federal

14  judge to save her from the immigration judge.  That's basically

15  what I was trying to say to the Federal judge, look, she's

16  probably going to be deported, she may be deported legally, but

17  you can at least not assist in that deportation.  That

18  deportation is wrong.  It's wrong because she doesn't deserve

19  to be deported, but there's nothing we could do.  The

20  Government isn't going to reduce.  So I'm hoping that the judge

21  can do something.  You know, it was a strategy.

22            MR. ORTIZ:  Understood.

23            Your Honor, could I just check on the petitioner

24  real quick?

25            THE COURT:  Yes.

1      MR. CHILDS:  Your Honor, do we have some Kleenex,

2  maybe?

3      THE COURT:  Yes, we have Kleenex.

4      MR. ORTIZ:  Thank you, your Honor.

5  BY MR. ORTIZ:

6  Q.    So on Page 5, Lines 4 and 5, there is also a reference to

7  avoiding deportation.  Is that your same answer, that in that

8  statement, you meant avoiding apprehension, not actual

9  deportation?

10 A.    Yes.  I assumed that the judge and Mr. Childs would

11 understand that there's nothing that the District Court can do

12 about the immigration consequences, legal consequences.  The

13 only thing it can do is decide where Ms. -- what's going to

14 happen to Ms. Garcia physically.

15 Q.    Sure.

16 A.    And that's what I was talking about, physical removal.

17 Q.    And not to belabor this, but also on Page 7, Lines 19

18 through 24, there was another reference to allowing Ms. Garcia

19 to remain in the country.  I'm assuming that you meant the same

20 thing?

21 A.    Exactly.

22 Q.    Okay.  And what did you mean by intermittent confinement?

23 A.    Let me -- where is that?

24      MR. CHILDS:  It's on Page 7.

25 A.    You know, I'm not sure at this point what I meant.  Maybe

1   on the weekends or something.  I don't know.  All I was trying

2   to say is not in the Federal prison.

3   BY MR. ORTIZ:

4   Q.    And is it your opinion that if she was doing something on

5   the weekend, going into some kind of custody, that she would be

6   able to avoid apprehension by doing that?

7   A.    It was my hope that that could be a reason for the judge

8   to reduce the sentence to time served.  Whether, in fact -- if

9   the judge had given her probation, whether people live in,

10  like, a community prison or a county jail, or the probation

11  officer would have, you know, run to the Department of Homeland

12  Security, I don't know.  I still don't know.  I have no

13  expertise in that.  All I'm trying to do is get her less time.

14  Q.    Sure.

15  A.    And the thing, Mr. Ortiz, is that I believe that Mr.

16  Childs -- well, when we get the transcript, he understood

17  exactly that strategy and he said, I'm going to follow her to

18  the edge of the earth and make sure she is reported to Homeland

19  Security.  But the fact is we have a schizophrenic system where

20  it could be that people don't have the responsibility to turn

21  people in to Immigration.  I don't know.  But that's what I was

22  told, which made me convince the judge to give her less time.

23        But I never believed that anything the judge did

24  would change her legal immigration status.  I was not using the

25  word deportation or immigration in that sense.

1  Q.    But would you agree that avoiding deportation in a legal
2  sense and avoiding apprehension are two different legal
3  concepts?
4  A.    Yes, I would agree to that.
5  Q.    Okay.
6  A.    When I wrote the sentencing position, I really wasn't --
7  I was just thinking of the apprehension.  And it never occurred
8  to me that anyone would have a problem understanding exactly
9  what I was saying.  And the reason is because all of the
10 participants in the criminal justice system understand that
11 there's this dichotomy where you have the immigration court on
12 the one side and the criminal court on the other.
13 Q.    Understood.  So is there a way that the Court could have
14 structured the sentencing that would have avoided apprehension?
15 A.    I don't know that.
16 Q.    So then why didn't you put any qualifiers to that,
17 saying, may avoid deportation, may avoid apprehension?
18 A.    Because I'm an advocate and I'm trying to convince the
19 judge not to put her in jail.  That's all.
20 Q.    Understood.  So before giving Ms. Garcia this immigration
21 advice telling her that she was subject to mandatory
22 deportation, did you consult with any attorneys, any
23 immigration attorneys?
24 A.    No, I don't believe I did.  I know that there's a
25 reference I said I talked to a couple of attorneys.  I can't

1  remember that at this time.  All I knew is that selling

2  100 kilograms of marijuana is going to be a deportable offense

3  and the Government refused to reduce it.

4  Q.    So if we can go to the sentencing transcript, the Court,

5  right off the bat, asked about what guarantee a sentence to

6  probation would provide that would allow her to avoid

7  deportation altogether.

8          MR. CHILDS:  Counsel, do you want to reference a

9  page?

10         MR. ORTIZ:  Yes.  It's Page 4, Lines 17 through 21.

11  BY MR. ORTIZ:

12  Q.    The Court said, "First of all, I want to know what

13  guarantee, Mr. Bisnow, if she were placed on an RRC or in-home

14  detention -- and I'm not saying that I'm going to do that --

15  that the result would be that she would continue working and

16  not suffer deportation."

17         And, essentially, the ultimate response that you

18  gave was that, "My knowledge of immigration rules are -- and

19  I've spoken to a couple of attorneys -- that these crimes would

20  be crimes involving moral turpitude that would subject her to

21  possible deportation, but, of course, that doesn't mean that

22  she would be deported."

23         Let me zoom out.  Maybe that will help.

24  A.    Yes, I'm familiar with all that.  What is your question?

25  Q.    So the first question is, was it your belief that when

1   the Court asks what guarantees that you could give that she

2   would avoid deportation, that the Court was just asking about

3   apprehension?

4   A.    Yes.   I believe the Court understood.   Maybe I was wrong,

5   but I believe the Court understood that I was talking about

6   apprehension because she's saying the result would be that she

7   could continue working and not suffer deportation.   I believe

8   the Court is saying there she would not be apprehended.   She's

9   not saying that her legal status of deportable would be a --

10  would change; she's asking me, practically, are they going to

11  pick her up?   That's what I understood the question to be.

12            And then I answered -- and then I answered.   I

13  answered indirectly.   It was a difficult question for me.   I

14  answered indirectly, if she was sentenced to prison, she

15  certainly would be deported.   So what I'm trying to say is,

16  don't send her to Federal prison, give her less time.

17            And then the judge says, but, obviously, she has a

18  conviction and she still is possibly subject to deportation as

19  far as I understand the law.

20            And I said, that's correct, your Honor, that's

21  exactly what I believe, she is subject to deportation.

22            Then I -- then those next lines, 4 to 8, I don't

23  know what I meant.   I don't know why I put moral turpitude.   It

24  should have been aggravated felony.   But, again, when I say, of

25  course, that doesn't mean she would be deported, I'm meaning

1  that, of course, that doesn't mean she would be apprehended.

2  Okay?

3          And then what happened -- and this happens a lot in

4  criminal court -- is I was a little distracted, because you can

5  see that there were people, Mariana and Aaron, they were her

6  friends, and I think they just came in the courtroom, and I --

7  Ms. Garcia wanted me to introduce them, so I stopped my answer

8  and I introduced them.  And then when I go back to the answer,

9  I'm not really talking about -- I'm not really answering the

10  question.  I'm saying I answered the Court's question, but I'm

11  saying that she would be -- she would be good on probation and

12  she could -- her kids need them, need her.

13          And then what I really feel here is on -- if you go

14  to Page -- the next page where Mr. Childs starts talking on

15  Line 17, he's -- on Line 20, he's saying the Government will

16  take steps after this proceeding, after defendant is sentenced,

17  no matter what the sentence is, to notify the immigration

18  officials of defendant's status.  And, of course, that,

19  unfortunately, undercut a lot of what I was saying because I'm

20  trying to point out to the judge that she might not be removed

21  physically if she's given a prohibition sentence, and now here

22  Mr. Childs is stating, well, I'll make sure she is, even if

23  nobody -- even if the probation officer doesn't say it or the

24  custodial officer or the police officer.  If nobody tells

25  immigration, Mr. Childs is going to do it.  And, unfortunately,

1  that foiled my -- it threw a wrench into my strategy.

2  Q.    Understood.  So in the transcript, it said that you had

3  spoken to a couple of immigration attorneys; is that correct?

4          MR. CHILDS:  Objection, your Honor.  It misstates

5  the transcript.

6  A.    I said --

7          THE COURT:  If I had the transcript -- do I have it

8  over here?  Is this what you gave me?  Maybe this is --

9          MR. CHILDS:  I have an extra one, your Honor.

10         THE COURT:  No.  Let's see if this is it.  No, this

11  certainly isn't it.

12         MR. ORTIZ:  Your Honor, I can put it back on the --

13         MR. CHILDS:  He said, "I've spoken to a couple of

14  the attorneys."  He didn't say immigration attorneys.

15         THE COURT:  Okay.  So why don't you rephrase.

16  BY MR. ORTIZ:

17  Q.    So did you speak to immigration attorneys prior to

18  advising Ms. Garcia of the immigration consequences?

19  A.    I don't believe so, no.

20  Q.    So what you said in court, though, was saying that you

21  had spoken to immigration attorneys; is that correct?

22  A.    No, I didn't say immigration attorneys.  I said I spoke

23  to a couple of the attorneys.  And I -- at this time, I don't

24  know what I was referring to.  Those Lines 4 to 6, I don't know

25  what I was referring to.  I lost my train of thought.  And I

1  certainly didn't mean crimes of moral turpitude.  I meant

2  aggravated felony.  And I did mean that that would subject her

3  to possible deportation, but that doesn't mean she would be

4  physically deported.  But I can't tell you what the attorneys

5  were -- what I was thinking.  All I can say, looking back on

6  it, is that I think that I was distracted by some people in the

7  audience.

8  Q.   So you meant to say aggravated felony, but you said a

9  crime involving moral turpitude?

10  A.   Right.

11  Q.   Is there a difference between the two?

12  A.   I don't -- I'm not an expert on that.  I assume that

13  there is.  I have always (Zoom audio distortion) selling drugs

14  is an aggravated felony which can result in mandatory

15  deportation.  And that's why I called up Mr. Childs and asked

16  for a deal and asked for a reduction.

17  Q.   So you never meant to say that she was subject to

18  possible deportation either; is that correct?

19  A.   Well, I think I meant to say that she's subject to

20  possible removal, but it doesn't mean she would be removed.

21  Q.   So can you see how this statement may be confusing to

22  someone like Ms. Garcia who has no legal -- formal legal

23  training, that on one hand you're telling the Court that she

24  would be subject to a crime involving moral turpitude but then

25  on the other hand she is subject to mandatory deportation?

A.     I could see how it could be confusing to a person not

trained in the law; however, we did have the discussion about

her previous problem with immigration.  So perhaps, you know, I

assumed that she knew more than she did.  But she definitely

had a previous immigration lawyer who I would assume told her

that you can't be selling drugs and remain in the country and

that's why they got a deal there and got it reduced.

          And I also had told her, you know, that what I'm --

everything I'm saying, I'm saying about sentencing, I'm saying

about how much time you're getting, that's the whole ball game.

We have nowhere else to go.  The only thing I can do for you is

get you less time.  I can't help you with the legal immigration

status.

          But I do agree that, looking back, I certainly used

the terms in a particular way that a person not trained in the

law might not understand, at the time of the sentencing and the

sentencing hearing.

          But can I -- can I answer that question in one other

way also?  And that's to -- it's Page 79 of 96, or Page ID244,

where the Court asks me what I want to say in response.  And at

the bottom, on Line 25, it cites, "Hard for me as a lawyer to

look at our immigration system.  I think we are somewhat

schizophrenic.  I guess if Mr. Childs sees it as part of his

job, not only would he be the criminal prosecutor, but also to

be a liaison with the Department of Homeland Security with

1   respect to Ms. Garcia.  There's nothing I can do about it, but

2   I think there are certainly a lot of people out there who could

3   be deported who aren't deported, and I'm asking the Court to

4   take a chance on Ms. Garcia."

5         So I think what I was clearly saying -- I'm not

6   saying that anything that Mr. Childs said was false, because

7   remember, he said that he thought, you know, she would be

8   deported.  And I'm saying, look, if she gets deported, that's

9   what happens, but take a chance on her, give her time served,

10  and if she gets deported, she gets deported, because we know

11  that we have a schizophrenic system and sometimes there are

12  people out there who are deportable and yet aren't deported.

13  Q.    So would it be more consistent with your position now,

14  when the Court asked you what guarantee you could provide that

15  she wouldn't be deported, that it would have been better to

16  say, yes, Ms. Garcia is mandatorily deportable, but the best

17  that we can do is maybe structure a sentence to help her avoid

18  apprehension?

19  A.    Certainly.  When I look back, I could phrase it just like

20  you did.  That would be fine.  But at the time, you know,

21  sometimes when you're on your feet -- and I didn't know what

22  question the Court was going to ask me.  I didn't know what the

23  Court was gonna be interested in, so I just did the best I

24  could, you know?

25  Q.    Absolutely.  And nobody is doubting that, sir.  But you

1  would recognize that being mandatorily deportable in a legal

2  sense is different than avoiding deportation?

3  A.    Deporting meaning physical deportation, yes.

4  Q.    Okay.

5  A.    But the Court's question -- I think the Court -- and

6  maybe I'm wrong, but I think she was talking -- when the Court

7  says, "Could I put her on probation where she could continue

8  working and not suffer deportation, what guarantee do you

9  have," I think the Court was saying physical deportation.  I

10 wasn't -- I don't think the Court was saying that, what

11 guarantee do you have that -- that she won't have the legal

12 status of being deportable.  I don't think the Court was

13 interested in that.  The Court was interested in, so if I give

14 her probation, what's going to happen?  Might she physically

15 get deported while she's, you know, complying with the

16 conditions of probation?

17 Q.    Understood.

18 A.    And I did not answer that question as well as I could

19 have, I agree.

20 Q.    Understood.

21        MR. ORTIZ:  No further questions, your Honor.

22        THE COURT:  Do you have anything, Mr. Childs?

23        MR. CHILDS:  I have just maybe a couple of quick

24 questions.

25        THE COURT:  Okay.  Let's see if you cover what I'd

1   like to cover, but otherwise, I have a couple myself.

2            MR. CHILDS:  Certainly, your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. CHILDS:

5   Q.   Mr. Bisnow, in answer to your interrogatories --

6   A.   Yes, I'm still here.

7   Q.   In answer to your Interrogatory Number 1 on Page 4, you

8   state, quote, "I specifically discussed the legal effect of a

9   plea deal upon her immigration status.  I told her," meaning

10  the defendant, "that if she pled guilty to drug trafficking,

11  the law required her deportation."

12           Now, did you tell her that before she signed her

13  plea agreement?

14  A.   Yes.

15  Q.   And then answer to Interrogatory Number 1, Page 4, you

16  also say, quote, "I explained to Ms. Garcia that her State

17  attorneys had done a good job for her because the possession,"

18  referring to the possession conviction, "unlike drug

19  trafficking, did not automatically carry deportation."

20           Now, did you tell her that before she signed her

21  plea agreement?

22  A.   Yes.

23           MR. CHILDS:  No further questions, your Honor.

24           THE COURT:  Okay.  I think you may have covered

25  everything, but let me just ask you a couple of things,

1  Mr. Bisnow.

2          We've heard a lot of questions about what you

3  argued before --

4          THE WITNESS:  Are you there?

5          THE COURT:  Can you hear me now?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  We've heard a lot of questions --

8  I probably am not going to be facing you because I have to be

9  at the microphone, but we've heard a lot of questions about

10  what you argued before me at the time of the sentencing

11  hearing, and if I have the gist of what you've testified to

12  today, you understood that she was pleading guilty to a

13  deportable offense, but you thought it was less likely that she

14  would, in fact, be deported if she did not serve any custodial

15  time.  Was that your thought process?

16          THE WITNESS:  Yes.  She would not be -- yeah, I

17  would just add, by being deported, it was less likely that she

18  would physically be deported if she didn't go to State prison.

19          THE COURT:  Right.  And we're talking about --

20          THE WITNESS:  I mean Federal prison.  I'm sorry,

21  your Honor.

22          THE COURT:  Right, we're talking about Federal

23  prison.  But your understanding is that the Federal prisons

24  keep information regarding who is subject to deportation?

25          THE WITNESS:  Yes.  And I've learned that over the

1  years from my clients.  They will tell me that, as their term

2  is coming up, they are questioned about their immigration

3  status in their interview, before they're let out of prison,

4  and they have to show that they are not deportable.

5           THE COURT:  And I do think the most recent position

6  of the Bureau of Prisons is that they do not automatically send

7  people or report people to the Immigration Services at the

8  conclusion of their term.  There may be State law enforcement

9  agencies that do that, but be that as it may, what I'm trying

10  to understand is not what you communicated to me but what you

11  communicated to Ms. Garcia.  And my question is, did you

12  communicate to Ms. Garcia, besides telling her it was a

13  deportable offense, that you were going to try to get her a

14  non-custodial sentence because that decreased the likelihood

15  of -- in your view, the likelihood of her being discovered and

16  deported?

17           THE WITNESS:  I wouldn't put it exactly like that,

18  your Honor.  I told her I was going to try to get her a

19  non-custodial sentence because my job is to get her the least

20  time, and that's -- I'm just doing my job.  And then one of the

21  arguments I'm going to make is to try to convince the judge

22  that, because that would decrease the likelihood of physical

23  deportation, it would be a good selection as the outcome.

24           THE COURT:  Okay.  Did she say anything in response

25  to you?

1          THE WITNESS:  I don't recall.  I may have -- you

2   know, she was always very honest.  I felt she was a -- she was

3   on the right track.  She really -- once she decided to plead

4   guilty, she really wanted, you know, for the Court to know

5   about her situation.  But I can't remember anything

6   specifically that she said.

7          THE COURT:  Okay.  But in the course of your

8   representation of her, did you come to learn that Ms. Garcia

9   was a so-called secretary to Mr. Vega?

10          THE WITNESS:  Yes.  I mean, that's the allegation.

11          THE COURT:  Right.  And you also came to believe

12   that she had left the gangs and was trying to put her life back

13   together; is that correct?

14          THE WITNESS:  Yes.  Exactly.

15          THE COURT:  However, you do understand that someone

16   who is a secretary to an MS-13 member, in all likelihood, has

17   some knowledge about the consequences of drug distribution and

18   things of that nature?

19          THE WITNESS:  You mean the immigration consequences?

20          THE COURT:  Yes.

21          THE WITNESS:  I don't -- I don't know.  I mean, I

22   can't say that we -- that we've really discussed her gang

23   knowledge.

24          THE COURT:  Okay.  Fair enough.

25          Okay.  I have nothing further to ask.  Anyone else?

1          MR. ORTIZ:  No, your Honor.

2          MR. CHILDS:  Not from the -- well, I do have one

3    question.

4          THE COURT:  Yes.

5                  FURTHER REDIRECT EXAMINATION

6    BY MR. CHILDS:

7    Q.    Mr. Bisnow, at the beginning of the cross-examination,

8    you said you explained to the defendant your game plan, what

9    you were going to approach the Government with initially.

10   Could you just -- could you reiterate for us what you explained

11   to Ms. Garcia, the defendant, what the game plan was that you

12   had for her prior to her signing the plea agreement?

13   A.    Well, we had a couple of different meetings, and she did

14   express concern about her green card.  And I said, you know,

15   this is a -- I think this is a deportable offense and I can't

16   help you like your other attorneys did in 2008 and '-9.  And

17   so -- and then when I talked to Mr. Childs and they don't -- I

18   believe it was after that, that discussion, that I talked to

19   Mr. Childs and I told him, look, Mr. Childs -- Mr. Childs

20   wanted to make a deal here and get a plea, and I said, you

21   know, she's got all these great things going for her, but she's

22   really afraid of being deported.  And he just laughed, so I

23   determined that the Government is not going to be reducing

24   this, so my game plan was to get her the least time I could in

25   any way that I could think of.  And I explained that to her.

1           MR. CHILDS:  No further questions, your Honor.

2           THE COURT:  Okay.  Mr. Ortiz, do you have anything?

3           MR. ORTIZ:  No, your Honor.

4           THE COURT:  All right.  Thank you, Mr. Bisnow.  We

5    appreciate your time.

6           THE WITNESS:  Okay.  Thank you, your Honor.  May I

7    be excused, then?

8           THE COURT:  You are.

9           THE WITNESS:  Okay.  Thank you.

10          THE COURT:  Anything else for today?

11          MR. CHILDS:  Not from the Government, your Honor.

12          MR. ORTIZ:  No, your Honor.

13          MR. CHILDS:  Could we get an estimate for how long

14   it would take for the transcript?

15          THE COURT:  I take it there's no intention of

16   calling Ms. Garcia?

17          MR. ORTIZ:  No.  We both are satisfied with her

18   declaration.

19          MR. CHILDS:  That's correct, your Honor.

20          THE COURT:  Okay.

21          MR. ORTIZ:  Thank you.

22          THE COURT:  Thank you, everybody.

23          (Proceedings concluded at 11:22 a.m.)

24

25

**42**

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3   COUNTY OF LOS ANGELES     )
                              )
4   STATE OF CALIFORNIA       )

5

6            I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17            DATED THIS 4TH DAY OF JANUARY, 2022.

18

19

                       /s/Judy K. Moore
20            _____
                   JUDY K. MOORE, CRR, RMR
21            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25